# United States Court of Appeals

## For the Eleventh Circuit

---

No. 98-2006

---

District Court No. 94-1112-CV

99 JUL **FILED**
U.S. COURT OF APPEALS
CLERK ELEVENTH CIRCUIT
MIDDLE
A

**APR - 6 1999**

**THOMAS K. KAHN**
**CLERK**

MCA TELEVISION LIMITED, a Delaware Corporation,

Plaintiff-Counter-Defendant-
Appellee-Cross-Appellant,

versus

PUBLIC INTEREST CORPORATION, a Florida Corporation,

Defendant-Counter-Claimant-
Appellant-Cross-Appellee.

------------------------

Appeals from the United States District Court
for the Middle District of Florida

------------------------

Before DUBINA and BARKETT, Circuit Judges, and JONES*, Senior Circuit Judge.

## JUDGMENT

These causes came to be heard on the transcript of the record from the United States District Court for the Middle District of Florida, and was argued by counsel;

UPON CONSIDERATION WHEREOF, it is now hereby ordered and adjudged by this Court that the judgment of the said District Court in these causes be and the same is hereby AFFIRMED in part and REVERSED in part; and that this cause be and the same is hereby REMANDED to said District Court for further proceedings in accordance with the opinion of this Court;

It is further ordered that plaintiff-counter-defendant-appellee-cross-appellant pay to defendant-counter-claimant-appellant-cross-appellee, the costs on appeal to be taxed by the Clerk of this Court.

_____

*Honorable Nathaniel R. Jones, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

Entered: April 6, 1999

For the Court: Thomas K. Kahn, Clerk

By: _____

Deputy Clerk

ISSUED AS MANDATE:    JUL 2 3 1999

A True Copy - Attested:
Clerk, U.S. Court of Appeals
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

2

MCA TELEVISION LIMITED, a Dela-
ware Corporation, Plaintiff–Counter–
Defendant–Appellee–Cross–Appellant,

v.

PUBLIC INTEREST CORPORATION, a
Florida Corporation, Defendant–Coun-
ter–Claimant–Appellant–Cross–Appellee.

No. 98–2006.

United States Court of Appeals,
Eleventh Circuit

April 6, 1999.

Licensor of syndicated television pro-
grams brought action asserting breach of
contract and copyright infringement claims
against licensee which owned television sta-
tion. Licensee brought counterclaim, alleging
breach of contract and violation of federal
antitrust law. Following bench trial, the Unit-
ed States District Court for the Middle Dis-
trict of Florida, No. 94–1112–CV–T–24A, Su-
san C. Bucklew, J., entered judgment for
licensor on its contract and copyright claims,
but ruled in favor of licensee on its antitrust
claim. Licensee appealed, and licensor cross-
appealed. The Court of Appeals, Barkett,
Circuit Judge, held that: (1) action "arose
under" Copyright Act; (2) licensee breached
contract; (3) stipulated damages provision
was invalid because it permitted double re-
covery; (4) condition on licensing of some
programs for barter that required licensee to
license another program for cash as well as
barter was per se illegal tying arrangement

under the Sherman Act; and (5) licensee
might be able to show antitrust injury as
result of tying arrangement.

Affirmed in part, reversed in part, and
remanded.

1. Copyrights and Intellectual Property
   ⌸79

   Action brought by licensor of syndicated
television programs against licensee, which
sought preliminary injunction and damages
under Copyright Act, "arose under" Act, so
that district court had subject matter juris-
diction, despite defendant's claim that action
was primarily contract dispute and that copy-
right claim was only incidental to disposition
of case. 28 U.S.C.A. § 1338.

2. Copyrights and Intellectual Property
   ⌸79

   An action "arises under" the Copyright
Act, for jurisdictional purposes, where the
complaint is for a remedy expressly granted
by the Act, such as a suit for infringement.
28 U.S.C.A. § 1338.

   See publication Words and Phrases
   for other judicial constructions and def-
   initions.

3. Contracts ⌸305(3)

   Under Florida law, licensee's late pay-
ments for license of syndicated television
programs constituted breach of contract, not-
withstanding licensor's previous acceptance
without protest of licensee's consistent late
payments, in view of anti-waiver provision
contained in licensing contracts, stating that
acceptance of late payments did not waive
any of licensor's rights except as to payment.

Synopsis, Syllabi and Key Number Classification
COPYRIGHT © 1999 by WEST GROUP

The Synopsis, Syllabi and Key Number Classifi-
cation constitute no part of the opinion of the court.

### 4. Contracts ⬅305(1, 3)

Under Florida law, a creditor may conduct itself in such a manner that it either waives its right to declare a contract in default or is estopped to do so without first giving the debtor notice of its intent to declare a default; when a creditor's conduct in habitually accepting late payments rises to the level of a waiver, then notice of intent to declare a default is ineffective to revoke such waiver and allow repossession, and the creditor must pursue other remedies, such as a suit on the note.

### 5. Contracts ⬅1

Contract law is designed to protect the expectations of the contracting parties.

### 6. Contracts ⬅321(1)

When a contract is breached, an injured party can look to the legal system for help in achieving the position he or she would have occupied upon the performance of the promise, that is, for his or her expectation interest, otherwise known as the benefit of the bargain.

### 7. Damages ⬅89(2)

Unlike tort law, which permits the imposition of punitive damages as a means to deter disfavored conduct, contract law does not allow for punitive damages unless the breach of contract is also a tort for which punitive damages are recoverable.

### 8. Damages ⬅80(1)

Under Florida law, parties may not use stipulated damages provisions as a way to secure for themselves greater damages in the event of a breach than contract law would normally allow; if a court finds the damages stipulated to be out of all proportion to the reasonably anticipated loss from nonperformance, it will conclude that the provision was intended to impose a penalty for breach, held in terrorem over the promisor to deter him from breaking his promise.

### 9. Damages ⬅79(1), 80(1)

Under Florida law, to enforce a stipulated damages provision as liquidated damages, the court must find, first, that the damages consequent upon a breach must not be readily ascertainable, and, second, that the sum stipulated to be forfeited must not be so grossly disproportionate to any damages that might reasonably be expected to follow from a breach as to show that the parties could have intended only to induce full performance, rather than to liquidate their damages.

### 10. Copyrights and Intellectual Property ⬅109

**Damages ⬅80(1)**

Under Florida law, default provision in agreement for license of syndicated television programs which allowed licensor, upon breach by licensee, to receive full payment of entire contract price, regardless of number of shows that had yet to be aired at time of breach, and to revoke broadcast licenses for balance of unaired shows and pursue other legal and equitable remedies, such as copyright claim, was not valid stipulated damages provision, but penalty, since it would allow for inconsistent double recovery.

### 11. Election of Remedies ⬅3(1)

To prevent double recovery, plaintiffs are precluded under the election of remedies doctrine from advancing inconsistent theories of recovery, and, when determining whether remedies are inconsistent, courts consider the relation of the parties with reference to the right sought to be enforced.

**12. Damages ⬗85**

Under Florida law, when a damages clause is held to be an unenforceable penalty, the party seeking to recover for the breach must allege and prove his actual damages.

**13. Monopolies ⬗17.5(9.1)**

Agreement that conditioned licensing of several of licensor's television shows for barter on licensee's willingness to license episodes of one particular program for cash as well as barter constituted "block booking" that was per se illegal tying arrangement in violation of the Sherman Act. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

> See publication Words and Phrases for other judicial constructions and definitions.

**14. Monopolies ⬗28(1.4)**

To recover under Clayton Act section permitting any person injured in his business or property by reason of anything forbidden by antitrust laws to recover threefold damages and cost of suit, including reasonable attorney's fee, the injured party must demonstrate not only an antitrust violation, but also "antitrust injury," that is, injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. Sherman Act, § 4(a), as amended, 15 U.S.C.A. § 15(a).

> See publication Words and Phrases for other judicial constructions and definitions.

**15. Monopolies ⬗28(1.4)**

Although licensee of syndicated television programs suffered no injury as result of

tying arrangement by which licensor conditioned its license of some programs for barter on licensing of another program for barter and for cash, as to barter arrangement, because licensee welcomed barter portion of contract, licensee may have suffered damages as result of cash payment requirement, regardless of whether payments were actually made, since such requirement may have resulted in licensee's loss of opportunity to seek alternative programming. Sherman Act, §§ 1, 4(a), as amended, 15 U.S.C.A. §§ 1, 15(a).

**16. Contracts ⬗105**

Where a statute expressly or by implication prohibits the making of a certain kind of contract, it is clear that any agreement in violation of that statute is unenforceable.

**17. Monopolies ⬗28(9)**

Recovery of attorney's fees under Clayton Act does not depend on any minimal injury requirement, so long as some actual injury was suffered. Sherman Act, § 4(a), as amended, 15 U.S.C.A. § 15(a).

———————

Appeals from the United States District Court for the Middle District of Florida.

Before DUBINA and BARKETT, Circuit Judges, and JONES *, Senior Circuit Judge.

BARKETT, Circuit Judge:

Public Interest Corporation ("PIC") appeals from a $1.8 million judgment entered in favor of MCA Television ("MCA") following a non-jury trial on MCA's breach of contract and copyright infringement claims. The dis-

---

* Honorable Nathaniel R. Jones, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

trict court found that PIC breached its licensing contracts with MCA, and violated MCA's copyright of several television shows by airing them after MCA revoked its broadcast licenses following PIC's breach of contract. In addition, MCA appeals the district court's ruling in favor of PIC's antitrust claim. PIC had alleged that MCA's conditioning of its licensing to PIC of several[1] first-run television shows for barter on the willingness of PIC to license a further first-run series called *Harry and the Hendersons* for cash as well as barter constituted an illegal tying arrangement in violation of the Sherman Act. The district court agreed, but found that PIC failed to prove "antitrust injury" and thus merited no damages on its antitrust claim. We affirm in part and reverse in part.

### FACTS

At the time of the events giving rise to this action, PIC was a Florida corporation that owned and operated television station WTMV–TV in Lakeland, Florida. MCA owns and licenses syndicated television programs. In 1990, the parties entered into a licensing contract with respect to several first-run television shows. With respect to all but one of these shows, MCA exchanged the licenses on a "barter" basis for advertising time on WTMV. However, MCA conditioned this exchange on PIC's agreeing to license the remaining show, *Harry and the Hendersons ("Harry")*, for cash as well as for barter. PIC agreed to this arrangement, although it would not have chosen to license *Harry* if it did not have to do so in order to secure the licenses for the other shows. Both parties signed an interim contract reflecting these arrangements. In the following years, the parties entered into new contracts licensing four other MCA shows to PIC.[2]

The contracts under which the parties operated contained the following language:

> When signed by [PIC] and MCA, this document shall constitute a valid and binding Agreement and shall be deemed to include the standard terms and conditions known as "Additional Provisions" which are contained in MCA's standard series syndication Licensing Agreement. Copies of the "Additional Provisions" are available on request and will be fully set forth in a long-form contract.

Each Licensing Agreement, under the heading "Additional Provisions of the Agreement," established a payment schedule and stated that any late payment constituted a default which gave MCA the right to terminate the license. The "Additional Provisions" portion of the licensing contracts also contained a waiver to the effect that "[a]cceptance of any payment after its due date shall not constitute a waiver by Licensor of any of its rights except as to payment," and an accelerated damages clause. The accelerated damages clause provided MCA, in the event of a default by PIC, with both damages equivalent to the full value of the contract in the event of a breach and the right to revoke PIC's broadcast licenses and to pursue any "legal and equitable remedies that are available to [MCA]" as a consequence of their doing so.

From the beginning, PIC's payments were consistently two to nine months behind schedule. This pattern of late payment con-

---

1. The parties disagree as to how many shows were the object of this contract. In its brief, PIC names seven; MCA adds an eighth.

2. These shows included *List of a Lifetime, List of a Lifetime II, Magnum P.I.,* and *17 Miscellaneous Features.*

tinued for over two years without objection by MCA.

For two and a half years following the original contracts, PIC broadcast *Harry,* paying MCA with three minutes of advertising time per episode pursuant to the barter provisions of the contract. In September of 1993, before payments for the cash portion of the *Harry* contract were scheduled to begin, PIC informed MCA that it did not believe it was obligated under that portion of the contract. In April 1994, MCA demanded payment from PIC for *Harry,* as well as for the four other programs PIC had subsequently purchased. At that time, the combined amount PIC owed on these contracts was $175,000. PIC responded by reiterating that it was not obligated to perform the cash portion of the *Harry* contract, and that, according to the delayed payment schedule that MCA had accepted without protest until that point, it was not behind in its payments for the other four programs.

In May of 1994, MCA gave PIC written notice of the termination of its broadcast rights. PIC requested an extension, which MCA granted through June 1, 1994. Negotiations continued through that date, but eventually fell apart. In a letter dated June 29, 1994, MCA suspended PIC's broadcast rights for all of its shows, and stated that "[a]ny telecasts of MCA programming by WTMV–TV on or after June 1, 1994, will be deemed unauthorized and shall constitute an infringement of MCA's copyrights in and to those programs." PIC nonetheless continued broadcasting MCA's programs, with the exception of *Harry.*

On July 1, 1994, MCA filed suit against PIC alleging copyright infringement and

breach of contract. It also sought and obtained a preliminary injunction to prevent PIC from further broadcasts of its television shows. PIC filed a counterclaim, contending that MCA's actions were themselves in breach of contract and violated federal antitrust law,[3] and continued its broadcasts of MCA programming until just before the district court enjoined it from so doing.

After a bench trial, the district court found that PIC had breached its licensing contracts with MCA prior to June 1, 1994, and that PIC's 106 broadcasts of MCA programs after that date constituted willful copyright infringement. For damages on these claims, the district court awarded MCA $804,538.65 for breach of contract, and $1,060,000.00 for copyright infringement. As for PIC's antitrust counterclaim, the district court found that the licensing contract for *Harry* was an illegal tying contract in violation of the Sherman Act and was therefore not enforceable. However, it concluded that PIC had failed to prove "antitrust injury" and that PIC was therefore entitled to no damages for MCA's antitrust violation.

PIC now appeals the district court's order on MCA's breach of contract and copyright infringement claims and on the issue of damages for the antitrust violation. MCA cross-appeals the district court's determination that its conditioning of the initial contracts on PIC's licensing of *Harry* constituted an antitrust violation.

DISCUSSION

### I

[1] As a threshold matter, PIC argues that this case is primarily a common law

---

3. The district court found against PIC on its breach of contract counterclaim. PIC does not     appeal on this issue.

contract dispute with a merely incidental copyright claim and therefore that the federal courts have no subject matter jurisdiction to hear this case. In *MCA Television Ltd. v. Feltner,* 89 F.3d 766 (11th Cir.1996), the defendant argued, on virtually identical facts, that the district court lacked subject matter jurisdiction because the case did not "arise under" the Copyright Act, 17 U.S.C. § 501 *et seq,* and was merely a breach of contract claim. We disagreed, and held that the federal courts had subject matter jurisdiction to hear the case. *See id.* at 768.

However, PIC points out that *Feltner* offers no reason to support its conclusion, and argues that the standard adopted by *Sullivan v. Naturalis, Inc.,* 5 F.3d 1410, 1413 (11th Cir.1993), the case on which *Feltner* relies, points to the opposite result. In *Sullivan,* we cited with approval Judge Friendly's articulation of the standard for jurisdiction under 28 U.S.C. § 1338, which grants federal courts original jurisdiction to hear cases relating to copyright: "[A]n action 'arises under' the Copyright Act if and only if the complaint is for a remedy expressly granted by the Act, e.g., a suit for infringement . . . , or asserts a claim requiring construction of the Act . . . , or at the very least and perhaps more doubtfully, presents a case where a distinctive policy of the Act requires that federal principles control the disposition of the claim." *Sullivan,* 5 F.3d at 1412 (citing *T.B. Harms Co. v. Eliscu,* 339 F.2d 823, 828 (2d Cir.1964) (opinion of Friendly, J.)).

[2] PIC argues that because it stipulated that MCA owned the copyright to the pro-

grams at issue, the copyright issue is only incidental to the disposition of the case. As the *Harms* standard clearly states, however, an action "arises under" the Copyright Act where the complaint "is for a remedy expressly granted by the Act, e.g., a suit for infringement." *Harms,* 339 F.2d at 828. In its complaint, MCA sought both a preliminary injunction and damages under the Copyright Act. The suit therefore "arises under" the Act according to the standard this Court adopted in *Sullivan* and applied in *Feltner.*[4]

## II

[3] The district court held that PIC had been in breach of the contract when MCA revoked its broadcast licenses. It based this judgment on the fact that in June 1994, at the time of the revocation of its licenses, PIC was current in the payment of its bills to MCA only through October of 1993.

PIC, however, argues that, according to the late payment schedule it had followed for the two years since it had committed to cash payment for MCA's shows, it had not been delinquent in June of 1994, and that because MCA had failed to object to the payment schedule for the previous two years, MCA was estopped from responding to PIC as if PIC was in breach at the time MCA revoked its broadcast licenses.

[4] In the ordinary case, this argument would find support in the Florida caselaw. *See Walker v. Ford Motor Credit Co.,* 484 So.2d 61, 62–63 (Fla.Dist.Ct.App.1986).[5] But

---

4. We do, of course, analyze the state law claims presented under the law of Florida, the state in which this suit arose.

5. The case law in Florida is clear that a creditor may conduct itself in such a manner that it either waives its right to declare a contract in **default or is estopped to do so without first giving the debtor notice of its intent to declare a default.** When a creditor's conduct in habitually accepting late payments rises to the level of a waiver, then notice of intent to declare a default is ineffective to revoke such waiver and

the contract at issue here contained an anti-waiver provision. As the district court noted, the payment provision of the contracts states that "[a]cceptance of any payment after its due date shall not constitute a waiver by Licensor of any of its rights except as to such payment." In *Philpot v. Bouchelle*, 411 So.2d 1341 (Fla.Dist.Ct.App.1982), the plaintiff landlord had routinely accepted late payments from the defendant. The court conceded that, in the main, the rule in such cases is that "a lessor is estopped to assert a forfeiture for a breach of covenant or condition in a lease, or waives his right to such a forfeiture, if, after the breach of covenant, he accepts rent from his tenant with knowledge or full notice thereof." *Id.* at 1344. In *Philpot*, however, the contract between the parties contained a clause which provided in relevant part that "failure on the part of the lessor to exercise properly any rights given hereunder shall not operate to forfeit any of the said rights." *Id.* at 1343. The court found no waiver, reasoning that "the parties contractually modified the common law rules of waiver and estoppel, and their modification does not conflict with any public policy.... [B]ecause [the landlord] acted consistently with paragraph 15 of the contract, he cannot be deemed to have waived the appellee's failure of performance." *Philpot*, 411 So.2d at 1344–45.[6]

Thus, notwithstanding MCA's acceptance without protest of PIC's consistent late payments on the licensing contracts for four of its shows, we conclude based on the anti-waiver provision contained in the licensing contracts that, under Florida law, PIC was in

breach of contract when MCA declared it as such in June of 1994.

### III

Finding PIC liable on all counts, the district court awarded MCA $804,538.65 for breach of contract and $1,060,000.00 for copyright infringement. PIC argues that these damages "constitute a penalty, a double recovery, and are otherwise excessive." We agree.

[5–7] Contract law is designed to protect the expectations of the contracting parties. *See* MURRAY ON CONTRACTS § 117, at 671 (describing the purpose of contract law as "the fulfillment of those expectations which have been induced by the making of a promise"). When a contract is breached, an injured party can look to the legal system for help in achieving the position he or she would have occupied upon the performance of the promise—that is, for his or her "expectation interest," otherwise known as the "the benefit of the bargain." *See id.* Unlike tort law, which permits the imposition of punitive damages as a means to deter disfavored conduct, contract law does not allow for punitive damages unless the breach of contract is also a tort for which punitive damages are recoverable. *See id.* § 124, at 706–07.

[8] Because damages for breach of contract can be difficult to calculate, parties frequently stipulate in the contract itself to the amount of damages to be paid to the injured party in the event of a breach. Parties may not, however, use such stipulated damages provisions as a way to secure for

---

allow repossession; the creditor must pursue other remedies, such as a suit on the note. *Walker*, 484 So.2d at 62–63 (citations omitted).

6. *Philpot* has been reaffirmed by the Florida courts on at least one occasion, *see Eskridge v.*

*Macklevy*, 468 So.2d 337, 339 (Fla.Dist.Ct.App. 1985), and cited with approval on at least one other. *See Western World, Inc. v. Dansby*, 603 So.2d 597, 601 (Fla.Dist.Ct.App.1992).

themselves greater damages in the event of a breach than contract law would normally allow. *See id.* § 125, at 708–09. If a court finds the damages stipulated to be out of all proportion to the reasonably anticipated loss from nonperformance, it will conclude that the provision was intended to impose a penalty for breach, " 'held in terrorem over the promisor to deter him from breaking his promise.' " *Crosby Forrest Products, Inc. v. Byers,* 623 So.2d 565, 567 (Fla.Dist.Ct.App. 1993) (quoting 5 WILLISTON ON CONTRACTS § 776, at 668). And as Florida courts have consistently made clear, "this use of liquidated damages clauses to compel compliance with contractual terms[ ] has long been rejected." *Humana Medical Plan, Inc. v. Jacobson,* 614 So.2d 520, 521–22 (Fla.Dist.Ct. App.1992); *see also Crosby Forrest Products,* 623 So.2d at 567 ("A contract term which provides that a party must pay a penalty for breaching a contract is unenforceable.").

[9] Under Florida law, to enforce a stipulated damages provision as liquidated damages, the court must find, first, that "the damages consequent upon a breach must not be readily ascertainable[, and second, that] the sum stipulated to be forfeited must not be so grossly disproportionate to any damages that might reasonably be expected to follow from a breach as to show that the parties could have intended only to induce full performance, rather than to liquidate their damages." *Lefemine v. Baron,* 573 So.2d 326, 327 (Fla.1991); *see also Humana Medical Plan,* 614 So.2d at 522; *Hyman v. Cohen,* 73 So.2d 393, 398 (Fla.1954). Both these elements reflect the prohibition in con-

tract law against stipulated damages provisions that represent a penalty for breach.[7]

Florida courts have consistently recognized as a penalty a stipulated damages provision that allows the non-breaching party a choice of options in the event of a breach. For example, in *Lefemine v. Baron,* the Florida Supreme Court struck down as an unenforceable penalty a clause that allowed a seller to retain the buyer's deposit of 10% of the purchase price of real property *or* to "proceed at law or in equity to enforce his rights under the Contract" in the event of the buyer's breach. *Lefemine,* 573 So.2d at 327. The court found that such an option "indicates an intent to penalize the defaulting buyer [for the breach] and negates the intent to liquidate damages in the event of a breach." *Id.* at 329. As the court explained, "[t]he buyer under a liquidated damages provision with such an option is *always at risk for damages greater than the liquidated sum.*" *Id.* at 329–30 (emphasis added). The court therefore concluded that "neither party intend[ed] the stipulated sum to be the agreed-upon measure of damages," and, for this reason, that "the provision cannot be a valid liquidated damages clause." *Id.* at 330; *see also Pappas v. Deringer,* 145 So.2d 770, 773 (Fla.Dist.Ct.App.1962); *Stenor v. Lester,* 58 So.2d 673, 675 (Fla.1952).

This same reasoning applies with even greater force in cases where damages provisions allow the non-breaching party, not a choice *between* two options, each of which would allow a full recovery, but the right to pursue them both. In *Outrigger Resort Corp. v. L&E Corp.,* 611 So.2d 1358 (Fla.Dist.

7. *See* MURRAY ON CONTRACTS § 125, at 710 (explaining that the determination as to whether damages are readily ascertainable at the time of breach is "designed to corroborate the parties' assumed intention to honestly forecast damages in the event of a breach," since in cases where

damages would be easily ascertainable at the time of breach, "the need for such a clause evaporates and there is some suspicion that the clause was designed for purposes other than the legitimate purpose of honestly forecasting damages").

Ct.App.1993), for example, the court refused to enforce a damages provision that allowed a seller of real estate in the event of a default by the buyer to retain the deposit money *and* to sue at law "to recover damages for the full extent of its loss," finding this provision to be a "clear penalty." *Id.* at 1359. Obviously, a damages provision that allows both for retention of the deposit and for suit to recover full damages cannot be construed as one designed merely to provide the non-breaching party with the benefit of its bargain. Rather, such a clause serves at least two purposes that contract law does not countenance: First, it allows the provision to act as a deterrent to breach by holding the promisor "in terrorem," *Crosby Forrest Products*, 623 So.2d at 567 (quoting 5 WILLISTON ON CONTRACTS § 776, at 668); and second, it violates contract law's clear prohibition on double recovery, by allowing the non-breaching party to recover twice for the same wrong. *See* CORBIN ON CONTRACTS § 1223 at 482 ("Damages and restitution will not be given as concurrent remedies for the same injury. The plaintiff will not be given judgment for his money back and at the same time a judgment for the value of the performance promised him.").

**[10]** Turning to the case before us, we find that the "default" provision of the licensing contracts between MCA and PIC reveals a structure similar to the damages provision in *Outrigger*. The default provision in the licensing contracts between PIC and MCA states that, upon a default by Licensee PIC, Licensor MCA

> may, in addition to any other rights it may have, at its option, terminate this Agreement and/or declare this Agreement breached and declare the balance of the total net license fee and other amounts payable to Licensor hereunder immediate-

ly due and payable. Licensor may, during the existence of an unremedied breach of this Agreement, suspend delivery to or telecasting by Licensee, or both, of all films hereunder. If, despite Licensor's suspension of telecasting rights, Licensee continues to broadcast, then in addition to such other legal and equitable remedies that are available to Licensor, Licensor shall be entitled to enjoin any and all telecasts of the film(s) by Licensee.... Licensee acknowledges that the terms hereof and industry custom of licensing films substantially in advance of scheduled telecast, have the effect of rendering films hereunder unmarketable in the area covered by the telecasting from the designated city during any period encompassed by this Agreement, and therefore, no method exists for accurate measurement of damages upon the happening of an event of default hereunder. Therefore, in addition to all other remedies available to Licensor, Licensor shall be entitled upon default, to recover from Licensee as liquidated damages the full unpaid net license fee for all telecasts authorized hereunder, whether or not such telecasts actually occur....

In other words, in the event of a breach by PIC at any time during the life of the contract, this clause provides *both* (1) that MCA shall receive full payment of the entire contract price, regardless of the number of shows that had yet to be aired at the time of breach *and* (2) that MCA is entitled to revoke the broadcast licenses for the balance of the unaired shows, and to pursue "other legal and equitable remedies that are available to [MCA]" as a consequence.

In light of the Florida cases, this scheme cannot be read to reflect a good faith effort by the parties to liquidate their damages. MCA drafted the contract so that the whole contract price must be paid in the event of a

breach, because the "industry custom of licensing films substantially in advance of scheduled telecast, ha[s] the effect of rendering films hereunder unmarketable in the area covered by the telecasting from the designated city during any period encompassed by th[e] Agreement." Presumably, the idea here is that if PIC breached after the viewing season had begun, there would be no one left in Tampa to purchase MCA's programming and that as a result MCA would be unable to resell the programming in that market to make up the contract price. Assuming that this claim is correct as a factual matter, payment of the full contract price in the event of a breach would thus be the only way to protect MCA's expectation interest in the contract.

However, once MCA is guaranteed the full contract price in this way, its damages have been fully liquidated. That is, in the event of PIC's breach, the full contract price, and nothing more, is the measure of MCA's damages. Any further recovery on this contract would thus be by definition in excess of the amount of MCA's expectation interest in the contract. Yet despite MCA's having contractually consented to PIC's use of its programs and despite the fact that MCA is already guaranteed payment in damages for the full cost of the licenses, this provision provides MCA an additional source of recovery in the

event of a breach: it allows MCA to revoke PIC's broadcast license for the programs that remain unaired, and to sue in copyright if PIC persists in airing these shows, even if the manner of these subsequent broadcasts comports precisely with the manner agreed to in the licensing contracts.

Any licensee in PIC's position understands that copyright violation is a serious matter. The whole point of entering into licensing contracts such as those at issue here is to secure the consent of the license holder to the use of its material, in order to allow licensees to air copyrighted material in the agreed-upon manner without incurring liability in copyright infringement for doing so. Although a licensee should be able to treat a duly purchased broadcast license as precisely that—a license to use the material in the manner agreed to without the fear of a copyright infringement action for doing so—MCA through the wording of its contracts retains the right to wield the threat of a lawsuit for copyright infringement—and thus the threat of double recovery—as a club to pressure PIC to perform. This is nothing if not a clause " 'held in terrorem over the promisor to deter him from breaking his promise' " such as is prohibited by Florida law.[8] *See Crosby Forrest Products,* 623 So.2d at 567 (quoting 5 WILLISTON ON CONTRACTS § 776, at

---

8. That this is precisely the way this clause operates is clear from the actions taken by MCA during its negotiations with PIC during June of 1994. After negotiations broke down on June 24, MCA revoked PIC's licenses *retroactively* from June 1, and sued for copyright infringement on all broadcasts after June 1. Given that the parties were negotiating the performance of a contract, it is hard to see how the concept of "retroactive infringement" can have any meaning. PIC had through the contract purchased the rights to broadcast MCA's programs. The notion that MCA had the power retroactively to rescind the contract makes a mockery of that

contractual agreement and would put any contracting party in PIC's position in terror of upsetting the licensor in any way for fear of being declared in breach, having the contracted-for licenses "retroactively revoked," and being sued both for breach of contract *and* in copyright for statutory damages that can far outweigh contractually negotiated licensing fees. This is hardly the situation contemplated by contract doctrine, the point of which is to enable parties acting in good faith to arrange mutually beneficial agreements, and to anticipate from the start both the extent of their liability and fair dealing from their contractual counterpart.

668); *Humana Medical Plan,* 614 So.2d at 521–22.

For its part, MCA argues that the default provision does not allow for double recovery, but rather protects MCA from "two separate harms." In support of this argument, MCA points to *Paramount Pictures Corp. v. Metro Program Network, Inc.,* 962 F.2d 775 (8th Cir.1992), which on analogous facts held that, "[b]ecause the damage award for breach of contract and copyright infringement were for completely separate injuries, the district court correctly awarded both breach of contract damages and copyright infringement damages to [the plaintiffs]." *Id.* at 780.

We find *Paramount* unpersuasive, for two reasons. First, the *Paramount* court, finding that the defendants had failed to argue at trial that the damages clause constituted an unenforceable penalty, held that this argument had been waived on appeal. *See id.* at 778. It therefore declined to address the prohibition in contract law against recovering more than the actual damages suffered, which is the very issue we find dispositive here.

Furthermore, the *Paramount* court never addressed the election of remedies doctrine, which prohibits a double recovery for the same injury. It consequently relied on a legal fiction that this doctrine does not permit, that the airing of the shows subsequent to the licensor's revocation of the broadcast rights was logically separable from the fact that the parties had executed a contract allowing for broadcast of these shows in precisely the manner in which they were subsequently aired. *See id.* at 779. Although there may be two legal theories of recovery,

only one injury has been suffered: the airing of the shows without paying for them. We think it clear that the district court's order thus provides MCA with a double recovery for the same injury, as the application of the election of remedies doctrine plainly illustrates.

[11]   As we have seen, a basic premise of contract law is that injured parties cannot receive double redress for a single wrong. *See* Corbin on Contracts § 1223, at 483 ("[I]t is accepted social policy that an injured party should not be given [two] remedies for a single injury."). To prevent such a double recovery, plaintiffs are precluded under the election of remedies doctrine from advancing "inconsistent" theories of recovery.[9] When determining whether remedies are inconsistent, courts consider "the relation of the parties with reference to the right sought to be enforced." *McCormick v. Bodeker,* 119 Fla. 20, 160 So. 483, 484 (1935). In *Weeke v. Reeve,* 65 Fla. 374, 61 So. 749 (1913), for example, the plaintiff alleged fraudulent misrepresentations by the defendant with respect to the sale of land. The plaintiff sought both damages for the fraud and conveyance of the land. *See id.* at 750. The court found these remedies to be "coexistent and inconsistent," because "[i]n a suit to rescind the conveyance, the vendee repudiates the transfer, while in an action for damages the conveyance is ratified." *Id.; see also Klondike v. Blair,* 211 So.2d 41, 43 (Fla.Dist. Ct.App.1968) (citing with approval the reasoning in *Weeke* ). "[E]lection of one [of these remedies]," the *Weeke* Court therefore found, "is a bar to the use of the other."

---

9.  As one Florida court explained, "[t]he election of remedies doctrine is an application of the doctrine of estoppel and operates on the theory that a party electing one course of action should not later be allowed to avail himself of an incompatible course. The purpose of the doctrine is to prevent a double recovery for the same wrong." *Barbe v. Villeneuve,* 505 So.2d 1331, 1332 (Fla. 1987) (citations omitted).

*Weeke,* 61 So. at 750. The injured party, in other words, can either ratify the contract and sue for damages, or it can rescind the contract and repudiate it. It cannot, however, have it both ways.

Through the damages provision at issue here, MCA seeks to have it both ways. In demanding the full contract price in damages for the breach, MCA is effectively *ratifying* the contract, saying that the contract exists and that they are owed a recovery for its breach. But by revoking the broadcast licenses and suing in copyright, MCA is claiming to *rescind* the contract, thereby announcing that the rights established by the contract no longer exist. These statements cannot both be true—either the contract exists or it does not—but the damages provision at issue in this case would allow MCA to recover as if it were otherwise.

What the position taken by the Eighth Circuit in *Paramount* fails to recognize is that by incurring liability for the full contract price, PIC has, with MCA's consent, purchased the right to air the programs.[10] Once a licensing contract has been reached between the parties, the realm of contract has been entered. And under no principle of contract law may a seller both recover the full price of the contract from a defaulting buyer *and* sue to repossess the goods that were the object of the contract. For when the buyer has paid the full contract price, whether up front or pursuant to a damages action, *the buyer owns the goods.*

The default provision at issue in this case allows MCA the equivalent of recovering the price of the goods and at the same time demanding their return: it requires PIC to pay the full licensing fees for the broadcast and at the same time wields the threat of damages in copyright infringement to prevent PIC from airing the programs for which it has already paid.[11] This provision thus attempts to secure for MCA through the language of the contract the double recovery the election of remedies doctrine would otherwise forbid. Not only does this provision thus provide MCA a recovery for PIC's breach "disproportionate to the damages which could have been anticipated from breach of the contract," but it can only have been intended "to enforce performance of the main purpose of the contract by the compulsion of this very disproportion." *Crosby Forrest Products v. Byers,* 623 So.2d 565, 567 (Fla.Dist.Ct.App.1993) (quoting 5 WILLISTON ON CONTRACTS § 776, at 668). It therefore establishes, not liquidated damages, but a penalty, and thus cannot be enforced.

The Copyright Act is intended to protect copyright holders from unconsented-to pirating by those unwilling to pay the full value of the works used. When copyright holders agree to license their products in exchange for a fee, however, they have entered the realm of legally enforceable contracts, and have represented as much to their contractual counterparts. Of course, copyright protections remain in the background to ensure that licensees do not use materials in ways that exceed the scope of their licenses. But where the use comports with that agreed upon by the parties, the mere fact that the contract is for copyrighted material does not allow copyright holders to escape the con-

---

10. This circumstance is therefore vastly different from that in which a pirate violates a copyright without the consent of the holder.

11. *See United States Naval Institute v. Charter Communications, Inc.,* 936 F.2d 692, 695 (2d Cir.1991) ("[A]n exclusive licensee of any of the rights comprised in the copyright, though it is capable of breaching the contractual obligations imposed on it by the license, cannot be liable for infringing the copyright conveyed to it.").

straints of contract law. To enforce the damages provision at issue in this case would be to endorse MCA's use of the copyright protections to secure considerably more than a "fair return for [its] labors." *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 546, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). This we are not permitted to do.

Had this case presented a straightforward election of remedies problem—if, for example, MCA had both sought to recover full damages in contract and sued in copyright without using the language of the damages provision to do so—the appropriate course would have been to determine which alternative MCA had through its actions indicated an intent to elect. *See Weeke,* 61 So. at 750 ("The plaintiff having ratified the purchase of the land by bringing an action for damages, he cannot now repudiate the purchase and have recission."); *Barbe,* 505 So.2d at 1333–34 (reversing award in replevin action of stolen yacht because plaintiff already "voluntarily and intentionally sought and obtained" damages award for theft of purchase price). Here, however, MCA has sued based on the damages provision of the contract. The appropriate remedy will therefore be that applied by the Florida courts where damages provisions are found to be unenforceable penalties.

[12] Under Florida law, when a damages clause is held to be an unenforceable penalty, "the party seeking to recover for the breach must allege and prove his actual damages." *Stenor v. Lester,* 58 So.2d 673, 676 (Fla.1951); *see also T.A.S. Heavy Equipment, Inc. v. Delint, Inc.,* 532 So.2d 23, 25 (Fla.Dist.Ct. App.1988) (upholding both the trial court's determination that the clause was a penalty

"and its decision to award actual damages"); *Lefemine,* 573 So.2d at 330 (remanding the case "for a trial on the actual damages incurred ... as a result of the breach of contract"). We therefore hereby vacate the district court's award to MCA of $804,538.65 for breach of contract and $1,060,000.00 for copyright infringement, and remand this case for a determination by the district court as to the actual damages incurred by MCA as a result of PIC's breach. At that point, it will be up to the district court to determine whether the stipulation of the parties to the contract, to the effect that "industry custom of licensing films substantially in advance of scheduled telecast, ha[s] the effect of rendering films hereunder unmarketable in the area covered by the telecasting from the designated city during any period encompassed by th[e] Agreement," represents an accurate statement of the market conditions for broadcast licenses and thus whether MCA would still be entitled to the full contract price.

We emphasize that, in so holding, we take no position on whether, under other circumstances, a licensor would be entitled to treat a breach of a licensing contract as a recission, and to revoke broadcast licenses and sue in copyright for infringement if the licensee persisted in airing the programs.[12] We simply find, under the particular facts of this case, that the damages clause which allowed MCA in the event of a breach by PIC to sue for the full price of the contract, thus ratifying the contract, *and* to revoke PIC's licenses and sue in copyright as if there had been a recission, represents an unenforceable penalty under contract law. Because we so find, the appropriate remedy in this case, pursu-

---

12. We do, however, note that were such efforts to be accompanied by an attempt to recover the full contract price in damages, they would, under

Florida law at least, run afoul of the election of remedies doctrine.

ant to the Florida law, *see Stenor*, 58 So.2d at 676, is to vacate the district court's judgment on MCA's breach of contract and copyright infringement claims, and remand for a modification of MCA's recovery to reflect only the actual damages MCA suffered as a result of PIC's breach.

## IV

[13]  On its cross-appeal, MCA challenges the district court's finding that an agreement conditioning the licensing of several of MCA's shows for barter on PIC's willingness to license episodes of *Harry and the Hendersons* for cash as well as barter constituted an illegal tying arrangement in violation of § 1 of the Sherman Act. *See* 15 U.S.C. § 1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."). In reaching its conclusion, the district court relied on *United States v. Loew's, Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). In that case, the Supreme Court held in the television licensing context that "block booking" arrangements—in which a copyright holder "li-

cense[s], or offer[s] for license, one feature or group of features on condition that the exhibitor will also license another feature or group of features released by the distributors," *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 156, 68 S.Ct. 915, 92 L.Ed. 1260 (1948)—are *per se* illegal under the Sherman Act. *See Loew's*, 371 U.S. at 50, 83 S.Ct. 97 (applying *Paramount*'s *per se* prohibition on block booking to the licensing of films for television).[13]

MCA argues that the district court erred in applying the *per se* standard established in *Loew's* for illegal block booking arrangements. According to MCA, in the recent case of *State Oil Co. v. Khan*, 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997), the Supreme Court, "for all intents and purposes, rejected the *per se* approach used by the District Court" and "made clear that the correct standard to be applied [when assessing the legality of tying arrangements] is the 'rule of reason' standard."

This assertion misstates the holding in *State Oil*. In that case, the Supreme Court addressed itself to a *specific* type of contractual arrangement known as "vertical maximum price fixing."[14] *Id.* at ——, 118 S.Ct.

---

13. In *Paramount*, the Supreme Court found the practice of block booking to constitute an abuse of the protections of the Copyright Act, 17 U.S.C. § 1. As the Court explained,

> The sole interest of the United States and the primary object in conferring the [copyright] monopoly lie in the general benefits derived by the public from the labors of authors. It is said that reward to the author or artist serves to induce release to the public of the products of his creative genius. But the reward does not serve its public purpose if it is not related to the quality of the copyright. Where a high quality film greatly desired is licensed only if an inferior one is taken, the latter borrows quality from the former and strengthens its monopoly by drawing on the other. The practice tends to equalize rather than differentiate the reward for the individual copyrights. Even

where all the films included in the package are of equal quality, the requirements that all be taken if one is desired increases the market for some. Each stands not on its own footing but in whole or in part on the appeal which another film may have.... [T]he result is to add to the monopoly of the copyright in violation of the principle of the patent cases involving tying clauses.

*Paramount*, 334 U.S. at 158, 68 S.Ct. 915 (internal quotation marks omitted) (quoted in full in *Loew's*, 371 U.S. at 46–47, 83 S.Ct. 97).

14. The term "vertical maximum price fixing" refers to "agreements under which manufacturers or suppliers set the minimum resale prices to be charged by their distributors."

*State Oil*, 522 U.S. at ——, 118 S.Ct. at 279.

at 278. In the prior case of *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), the Court had held that vertical maximum price fixing constituted a *per se* violation of the Sherman Act. In *State Oil*, the Court overruled *Albrecht*, holding instead that the appropriate standard for evaluating the legality of *vertical maximum price fixing* is the rule of reason. *State Oil*, 522 U.S. at ——, 118 S.Ct. at 285; *see id.* (reasoning that "rule-of-reason analysis will effectively identify those situations in which vertical maximum price fixing amounts to anticompetitive conduct").

Although the Court in *State Oil* noted its "reluctance to adopt *per se* rules," *id.* at ——, 118 S.Ct. at 279, and likened vertical maximum price fixing to "the majority of commercial arrangements subject to the antitrust laws" that are "evaluated under the rule of reason," *id.* at ——, 118 S.Ct. at 285, we find nothing in that case to support MCA's claim that *State Oil* stands for a rejection of the *per se* standard in any context other than that of vertical maximum price fixing. In fact, in *State Oil*, the Court *reaffirmed* that some forms of restraint on trade "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *Id.* at ——, 118 S.Ct. at 279. As the Court went on to explain, "*[p]er se* treatment is appropriate '[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.'" *Id.* (quoting *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 344, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982)).[15]

The contract between MCA and PIC for the licensing of *Harry and the Hendersons* matches precisely one of the specific contractual forms—"block booking"—for which the Supreme Court has deemed the *per se* standard appropriate. In *Paramount Pictures*, the Supreme Court defined "block booking" contracts as those in which a copyright holder "license[s], or offer[s] for license, one feature or group of features on condition that the exhibitor will also license another feature or group of features released by the distributors." *Paramount Pictures*, 334 U.S. at 156, 68 S.Ct. 915. The *Harry* contract plainly fits this description. And not once, but twice, the Supreme Court has clearly stated that such "block booking" contracts are among those economic arrangements that will always be "condemn[ed]" under the rule of reason and will therefore always merit a

---

15. Our own circuit's precedent, although reflecting a similar reluctance to invoke the *per se* standard, has also continued to recognize that *per se* rules are appropriate under certain carefully drawn circumstances. *See. e.g., Southern Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*, 138 F.3d 869, 875 (11th Cir.1998) (recognizing that, although "most antitrust claims are analyzed under a 'rule of reason,' ... 'certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable *per se*'") (quoting *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 9, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984)); *All Care Nursing Serv., Inc. v. High Tech Staffing Serv., Inc.*, 135 F.3d 740, 746 (11th Cir.1998) ("Some acts have been said to be so facially anticompetitive that by their very nature they are deemed unreasonable and, thus, *per se* violative of antitrust laws."). As we explained in *All Care Nursing*,

[t]he decision to apply the *per se* standard [instead of the rule of reason] turns on "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output ... or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'"

*Id.* at 746 (quoting *Northwest Wholesale Stationers, Inc. v. Pacific Stationary and Printing Co.*, 472 U.S. 284, 289–90, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (brackets and ellipsis in original)).

finding of *per se* illegality. *See Paramount Pictures*, 334 U.S. at 159, 68 S.Ct. 915 ("[W]e hold to be illegal [ ] a refusal to license one or more copyrights unless another copyright is accepted."); *Loew's*, 371 U.S. at 50, 83 S.Ct. 97 ("Appellants' block booked contracts [for television programs] are covered by the flat holding in *Paramount Pictures*.").

We are not persuaded by MCA's efforts to distinguish this case from the block booking condemned in *Paramount* and *Loew's*. In *Loew's*, the Supreme Court explained that this specific form of "tying arrangement" is illegal *per se* because the licensor by virtue of its copyright is presumed to have "economic leverage sufficient to induce his customers to take the tied product along with the tying item." *See Loew's*, 371 U.S. at 45, 83 S.Ct. 97. MCA argues that because PIC desired its programming, not for its "uniqueness" but because PIC had no money and MCA was offering the licenses for barter, it was irrelevant to the inquiry that the programs were uniquely MCA's by virtue of copyright.

However, as the precedent makes clear, the licensee's reasons for wanting to license some of the licensor's programs and not others are irrelevant. The point is rather that each licensed program should stand on its own merits. "Where a high quality film greatly desired is licensed only if an inferior one is taken, the latter borrows quality from the former and strengthens its monopoly by drawing on the other.... Each [thus] stands not on its own footing but in whole or in part on the appeal which another film may have." *Paramount Pictures*, 334 U.S. at 158, 68 S.Ct. 915.

To determine whether the terms of the contract for *Harry* reflect coercive use of MCA's copyright, we must therefore look, not to the reason PIC found appealing the programs it wanted, but to the fact that it found unappealing the program it didn't. The district court found that PIC did not wish to license *Harry* for cash. Conditioning the licensing of the shows PIC did wish to license on its cash purchase of *Harry* thus allowed *Harry* to best the competition for the slot it eventually filled on PIC's roster entirely apart from its intrinsic appeal to PIC's programmers. This is precisely the sort of anticompetitive effect the *per se* rule of *Paramount* and *Loew's* intended to protect against,[16] and unless and until the Supreme Court explicitly overrules these cases, we must adhere to the rule they establish.[17] We therefore affirm the district court's conclusion that the *Harry* agreement was *per se* illegal under the Sherman Act.[18]

---

16. MCA also argues that "block booking only arises where the licensee is forced to acquire the unwanted programs in order to obtain the desirable programs" and that because none of the *Harry* episodes had previously been aired, it was impossible to determine the desirability of the episodes at the time the agreement was formalized. This argument entirely disregards the district court's explicit factual finding that PIC "was coerced into purchasing *Harry and the Hendersons*, which [PIC] either did not want at all or would have preferred to purchase strictly on a barter basis...."

17. *See Agostini v. Felton*, 521 U.S. 203, ——, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997) (" '[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.' ") (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).

18. MCA offers this circuit's recent decision in *Southern Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*, 138 F.3d 869 (11th Cir.1998) as support for its argument that the *Harry* contract would not be found invalid under the rule of reason standard. Because the appropriate standard for evaluating the legality of the arrange-

V

[14] Under Section 4 of the Clayton Act, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may recover "threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). To recover under this provision, the injured party must demonstrate not only an antitrust violation, but also "antitrust injury," that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also* Phillip Areeda, *Antitrust Violations Without Damage Recoveries,* 89 HARV.L.REV. 1127, 1128 (1976) ("An injury to a plaintiff's 'business or property' is a prerequisite for his receipt of treble damages under Clayton Act section 4. If it were possible for a defendant to violate an antitrust law, and yet produce no injury, he would be immune from private damage actions.").

[15] In *Loew's,* the Supreme Court explained that tying arrangements "are an object of antitrust concern for two reasons— they may force buyers into giving up the purchase of substitutes for the tied product, and they may destroy the free access of competing suppliers of the tied product to the consuming market." *Loew's,* 371 U.S. at 44–45, 83 S.Ct. 97. To be entitled to damages under the Clayton Act, PIC is therefore required to show that, as a consequence of its licensing of *Harry,* PIC suffered tangible financial harm for precisely these reasons— that PIC was unable to solicit, or be solicited for, more desirable programming to fill the slot allocated to *Harry.*

The district court found that no such showing was made. It therefore found no antitrust injury, and awarded no damages or attorney's fees to PIC on its antitrust claim. In reaching this conclusion, the district court treated separately the contractual provisions under which PIC licensed *Harry* for barter, and those under which PIC licensed *Harry* for cash.

With respect to the barter portions, PIC argued at trial that subsequent ratings revealed the fair market value of *Harry* to be $50 per episode, and that because PIC paid MCA three minutes of advertising per show, valued at $100 per minute, MCA therefore overcharged PIC by $250 per episode. The district court found PIC's assertion that its advertising time was worth $100 per minute to be unsubstantiated by the evidence, and also that PIC made no showing that it had other advertisers willing to pay "$100 per minute had the time not been taken by MCA." The district court also found that PIC was "desperate for programming" and that "no other syndicators would contract for programming on a barter basis with [PIC]." The district court therefore concluded that PIC proved no tangible harm as to the barter provisions of the *Harry* contract.

The district court reached the same conclusion as to the cash provisions of the contract. The district court reasoned that, because it had made the determination not to enforce that portion of the agreement, PIC will not have paid "any money in connection with the cash basis portion" and therefore will have "sustained no damages thereunder."

We agree that on the basis of the district court's unchallenged factual findings, PIC is

ment at issue here is the *per se* standard, we find    *Southern Card* to be inapposite.

foreclosed from arguing under the barter portion of the contract that it was prevented to its detriment from seeking other programming to fill the slot it gave to *Harry.* PIC was "desperate for programming," and testified that given the choice it would have taken *Harry* for barter because it would have "filled up airtime and didn't cost the station any money." By its own admission, therefore, PIC welcomed the barter portion of the contract and cannot now claim that it suffered antitrust injury thereby.

[16] We do not, however, agree with the district court's disposition as to the cash portion of the contract. The district court reasoned that because PIC did not pay any portion of the amount owing on the contract, it was somehow not harmed thereby. This reasoning, however, fails to recognize that if PIC suffered antitrust injury of the sort the proscription on block booking was intended to prevent, it will have been as a result of opportunities lost *at the time of contracting.* As we noted above, tying arrangements "are an object of antitrust concern for two reasons—they may force buyers into giving up the purchase of substitutes for the tied product, and they may destroy the free access of competing suppliers of the tied product to the consuming market." *Loew's,* 371 U.S. at 44–45, 83 S.Ct. 97. Any antitrust injury caused by the illegal contract for *Harry* would thus have begun to accrue at the moment PIC agreed to the contract, which is the very moment PIC's options for seeking alternative programming for the slot allotted to *Harry,* with the funds now earmarked for *Harry,* was foreclosed. This foreclosure is precisely the anti-competitive effect the proscription on block booking is intended to prevent. If PIC can prove that it suffered tangible financial harm as a result, it is entitled to treble damages.[19]

[17] Because the district court treated the contract as a nullity, it did not address the question whether PIC could successfully prove that it had suffered tangible financial harm as a result of the agreement's anticompetitive effects.[20] We therefore reverse the district court's finding of no antitrust injury as it bears on the cash portion of the *Harry* contract, and remand this case to the district court for a determination on this question.[21]

19. The district court was, of course, right not to enforce the cash portion of the *Harry* contract. "Where a statute expressly or by implication prohibits the making of a certain kind of contract, it is clear that any agreement in violation of that statute is unenforceable." MURRAY ON CONTRACTS § 98, at 528. It erred, however, in treating the contract as a nullity. The terms of the contract violated the antitrust laws. If PIC suffered antitrust injury thereby, the fact that the contract was not ultimately enforced by the courts does not negate that injury for purposes of the Clayton Act.

20. The parties dispute whether sufficient discovery was taken on the question of antitrust injury. We leave it to the discretion of the district court whether to rely on the extant record to reach its disposition on this question, or whether to re-open discovery to allow PIC further opportunity to make its case.

21. The district court, finding no antitrust injury, rightly concluded that such a finding will not support an award of attorney's fees under the statute. *See* 15 U.S.C. § 15(a) (codifying § 4 of the Clayton Act providing that in addition to treble damages, any party suffering injury "by reason of anything forbidden in the antitrust laws . . . shall recover . . . the cost of suit, including a reasonable attorney's fee"). We note, however, as this circuit has explicitly found, that "[n]owhere in Section 4 of the Clayton Act is a minimal injury requirement mentioned" and that "[a]ccordingly, . . . the dollar amount of the injury alleged is not relevant to the grant of attorney's fees." *Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1509 (11th Cir.1985); *see also Sciambra v. Graham News,* 892 F.2d 411, 416 (5th Cir.1990) (finding that "the structure of section 4 [of the Clayton Act] and the fact of damage analysis make the actual recovery of

MCA TELEVISION LTD. v. PUBLIC INTEREST CORP.        1985

CONCLUSION

In light of the foregoing, we find it unnecessary to reach the issues relating to the district court's disposition of MCA's copyright claims. This case is hereby AFFIRMED in part, REVERSED in part, and REMANDED to the district court for proceedings consistent herewith.

compensatory damages irrelevant to the recoverability of attorneys' fees"). Thus if, on remand, PIC is able to demonstrate that it suffered actual injury in any amount as a consequence of having agreed to the cash portion of the *Harry* contract,

PIC will also be entitled to recover attorneys' fees on this claim.

A True Copy - Attested:
Clerk, U.S. Court of Appeals
Eleventh Circuit

By: *[signature]*
Deputy Clerk
Atlanta, Georgia